Maureen Beyers, 017134
Eric M. Fraser, 027241
Brandon A. Hale, 027388
OSBORN MALEDON, P.A.
2929 N. Central Avenue, Suite 2100
Phoenix, Arizona 85012-2793
(602) 640-9000
mbeyers@omlaw.com
efraser@omlaw.com
bhale@omlaw.com

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Puppies 'N Love, a d/b/a of CPI, Inc.; Frank Mineo; Vicki Mineo, <br><br> Plaintiffs, <br><br> v. <br><br> City of Phoenix, <br><br> Defendant, <br> and, <br><br> The Humane Society of the United States, <br><br> Intervenor-Defendant. | Case No. CV 14-00073-PHX-DGC <br><br> **THE HUMANE SOCIETY OF THE UNITED STATES' MOTION TO INTERVENE** |

Pursuant to Federal Rule of Civil Procedure 24, the Humane Society of the United States ("HSUS") respectfully requests leave to intervene as of right in the above-captioned matter challenging Phoenix City Code § 8-3.06 (the "Ordinance") – an ordinance that HSUS supported and which, if overturned, will cause HSUS and its members harm to their personal and organizational interests in preventing animal cruelty. Alternatively, HSUS seeks permissive intervention pursuant to Rule 24(b).

**I.    BACKGROUND**

   **A.    Puppy Mills Have Devastating Effects on Both the Breeding Dogs and the Puppies that Are Born and Eventually Sold.**

HSUS is the nation's largest animal protection organization. Declaration of Kari Nienstedt ("Nienstedt Decl."), attached as **Exhibit A**, at ¶ 3; Declaration of

5302041

Melanie Kahn ("Kahn Decl."), attached as **Exhibit B**, at ¶ 2. Since its founding in 1954, HSUS has worked for the protection of all animals through advocacy, education, and direct animal care. Nienstedt Decl. at ¶ 3. HSUS rescues and cares for tens of thousands of animals each year, but its primary mission is to prevent cruelty before it occurs. *Id.*

HSUS supports pet adoption and responsible breeders, and opposes the sale of puppies bred in inhumane conditions regardless of where they are eventually sold. Kahn Decl. at ¶ 2. Throughout its existence, HSUS has worked to eliminate and ensure the proper oversight and regulation of large-scale inhumane commercial breeding facilities, commonly referred to as puppy mills. *Id* at ¶¶ 2-3.

The documented problems associated with puppy mills include overbreeding, inadequate veterinary care, overcrowding of cages, poor quality of food and shelter, and lack of socialization with humans. Kahn Decl. at ¶¶ 5-7. In puppy mills, breeding dogs often spend their entire lives confined to small, wire cages where they receive inadequate and unclean food and water, and often little to no veterinary care. *Id.* Research shows that the continuous confinement frequently causes the dogs to suffer from chronic anxiety, social isolation, inadequate stimulation, and lack of physical exercise. *See e.g.*, Jacquelin M. Stephen & Rebecca A. Ledger, *An Audit of Behavioral Indicators of Poor Welfare in Kenneled Dogs in the United Kingdom*, 8 Journal of Applied Animal Welfare Science 79, 79-96 (2005), attached as **Exhibit C**. Moreover, contrary to the recommendations of the American College of Theriogenologists and the Society for Theriogenology,[1] breeding dogs in puppy mills are normally bred every heat cycle. Kahn Decl. at ¶ 5. When they can no longer breed, the dogs are typically discarded or killed. *Id.*

Although the puppies born in puppy mills generally escape the inhumane conditions of the facilities early in life, the detrimental effects of the breeding operations are long-lasting. A landmark study appearing in Applied Animal Behavior

---

[1] Theriogenology is the veterinary study of animals' reproductive systems.

Science analyzing the behavioral characteristics of 1,100 dogs rescued from puppy mills who had been in their new homes an average of 2 years found that the dogs had significantly elevated levels of fears and phobias, compulsive and repetitive behaviors, and heightened sensitivity to being touched.  Franklin D. McCillan et al., *Mental Health of Dogs Formerly Used as "Breeding Stock" in Commercial Breeding Establishments*, 135 Applied Animal Behaviour Science 86, 86-94 (2011), attached as **Exhibit D**.  The dogs bred in these high volume commercial breeding operations also frequently suffer from hereditary diseases as a result of irresponsible breeding practices.  Kahn Decl. at ¶ 13.  Thus, the consumer ultimately suffers along with the dogs.  Kahn Decl. at ¶¶ 13-14.

### B.   The Interests of the Proposed Defendant-Intervenors.

HSUS undertakes substantial efforts intended to combat the proliferation of puppy mills.  For example, HSUS obtains USDA inspection reports of AWA-licensed facilities so that the organization can alert its membership and the public at large to the facilities that have gross, repeated violations of the AWA.  Kahn Decl. at ¶ 11-12.  HSUS also undertakes its own independent investigation of commercial breeding facilities to detect those that are especially inadequate when it comes to animal welfare.  *Id*.  In this regard, HSUS is uniquely qualified to challenge the inaccurate claims by Puppies 'N Love, the Plaintiff in this case, that it does not buy puppies from "puppy mills," and that restricting pet store sales of puppies is an inappropriate way of curbing inhumane breeding practices in substandard facilities.  As discussed below, publicly available records demonstrate that Puppies 'N Love has received dogs from suppliers that have been cited numerous times for their inhumane practices.

HSUS also has considerable expertise in responding to large-scale cruelty situations, and, as a result, has often been called upon by law enforcement to assist in rescues of dogs from puppy mills and other substandard breeding facilities. *See, e.g.*, Tracie Letterman, The HSUS Comments to USDA in Support of "Retail Pet Store" Definition Change, attached as **Exhibit E**, ("The HSUS Comments") at Attachment C

at pg. 5 ("Over the past 6 years, HSUS has assisted in removing more than 8,000 dogs and puppies from substandard breeding facilities where the animals were found suffering in unsanitary, overcrowded and inhumane conditions."). Following these rescues, HSUS is routinely forced to divert significant resources to the care of the seized animals, with total amounts sometimes rising into the tens-of-thousands of dollars range, absorbing the costs that would otherwise place a burden on local animal welfare groups and municipal law enforcement agencies. *Id.* at 5-6.

      **C.**     **Passage of the Ordinance and the Filing of this Action.**

Despite the efforts of HSUS and many others, the inhumane treatment of animals by puppy mills across the country persists. HSUS estimates there are at least 10,000 puppy mills in the United States, thousands of which supply puppies to pet stores across the nation, including those in Phoenix, Arizona. Kahn Decl. at ¶ 8. Most pet stores obtain their puppies from large-scale commercial breeding facilities because responsible breeders typically do not sell their puppies to pet stores. *Id.* at ¶ 16. A responsible breeder carefully screens potential customers and wants to know that the puppies she is breeding are ending up in homes where they are well-cared for; pet store and other third-party sales do not allow for this kind of control over the puppy's ultimate home. *Id.* In fact, publicly available records show that the Plaintiff in this very case receives dogs from known puppy mills in Missouri. Kahn Decl. at ¶ 12. According to the records, Puppies 'N Love's suppliers include the Hunte Corporation, possibly the largest commercial broker of puppy mill dogs in the nation. *Id.* HSUS has received more than 100 complaints from customers who have purchased sick puppies that came from the Hunte Corporation alone. *Id.* at ¶ 14. The records show that Puppies 'N Love also receives dogs from Elaine Wilson, Karen Schmidt, and Judy Speak Miller – all of whom have been cited for violations of the Animal Welfare Act. *Id.* at ¶ 12.

Unfortunately, most customers are unaware of the inhumane conditions in which puppies being sold in pet stores were bred, or the detrimental effect those

conditions can have on the animals they purchase, as well as on the consumer's own emotional and financial well-being when a puppy is ill as a result of the poor breeding conditions. As a result, some cities across the country, including Phoenix, are working to enact measures to restrict the sale of puppy mill dogs and protect consumers from the documented problems associated therewith.

On October 16, 2013, a policy advisor for one of Phoenix City's councilmembers called HSUS to discuss the councilmember's interest in addressing the well-documented problems involving commercially bred puppies. Nienstedt Decl. at ¶ 5. Over the next several weeks, HSUS and the councilmember's office discussed an ordinance restricting the sale of commercially bred kittens and puppies in retail pet stores, and promoting in-store adoptions of homeless dogs and cats to reduce the euthanasia of healthy pets in local shelters. *Id.* at ¶ 6-7. After the language of the Ordinance was drafted, HSUS encouraged its local members to help advocate for its passage. *Id.* at ¶ 8. On December 18, 2013, HSUS provided the City Council with written and oral testimony in support of the Ordinance. *Id.* at ¶ 9. The Ordinance passed and was scheduled to become effective January 17, 2014.

On January 14, 2014, Puppies 'N Love brought this action for declaratory and injunctive relief.

**III.    ARGUMENT**

Under Federal Rule of Civil Procedure 24, there are two methods for intervention – intervention as a matter of right, and permissive intervention. Fed. R. Civ. P. 24. Here, HSUS qualifies for both.

**A.    HSUS is Entitled to Intervene as a Matter of Right.**

Intervention is permitted as "of right" either when a federal statue authorizes intervention, or when the applicant

> claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

5323176                                                        5

Fed. R. Civ. P. 24(a)(2). In the Ninth Circuit, intervention "of right" involves a four-part test. *League of United Latin American Citizens v. Wilson*, 131 F.3d 1297, 1302 (9th Cir. 1997). The applicant must demonstrate (1) that the application is timely; (2) that the applicant has a "significantly protectable interest" relating to the property or transaction involved in the pending lawsuit; (3) that disposition of the lawsuit may adversely affect the applicant's interest unless intervention is allowed; and (4) that the existing parties do not adequately protect the applicant's interests. *U.S. v. Aerojet Gen. Corp.*, 606 F.3d 1142, 1148 (9th Cir. 2010); *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 817-18 (9th Cir. 2001). HSUS readily satisfies each of these requirements.

Although the party seeking to intervene bears the burden to show that all four elements are met, the requirements for intervention are broadly interpreted in favor of intervention. *Prete v. Bradbury*, 438 F.3d 949, 954 (9th Cir. 2006). In determining whether intervention is appropriate, the court is "guided primarily by practical and equitable considerations." *U.S. v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th Cir. 2004).

### 1. The Motion to Intervene is Timely.

HSUS's motion to intervene is timely. "Whether the motion is timely is determined by analyzing three factors: (1) the stage of the proceedings at which the applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reasons for and length of the delay." *Officers for Justice v. Civil Serv. Com'n of City and County of San Francisco*, 934 F.2d 1092, 1095 (9th Cir. 1991). HSUS easily satisfies the "timeliness" factor, as this motion to intervene is being filed less than one month after Puppies 'N Love commenced this action, before the City has even filed a responsive pleading, and before any substantive decisions have been entered. Under these circumstances, no party will be prejudiced by the admission of the HSUS into the case at this stage.

### 2. HSUS Has a Significant Protectable Interest in the Viability of the Ordinance.

HSUS also has a significant protectable interest relating to the transaction which is the subject of the action. The protectable interest requirement "is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *S. Cal. Edison Co. v. Lynch*, 307 F.3d 794, 803 (9th Cir. 2002) (quotation omitted). A party seeking to intervene need not demonstrate a "specific legal or equitable interest" in the suit. *U.S. v. Los Angeles*, 288 F.3d 391, 398 (9th Cir. 2002) (internal quotation marks omitted). It need only show that: "(1) it asserts an interest that is protected under some law, and (2) there is a 'relationship' between its legally protected interest and the plaintiff's claims," i.e., that the "resolution of the plaintiff's claims actually will affect the applicant." *Id.*

It is well-established under this standard that "a public interest group that has supported a measure (such as an initiative) has a 'significant protectable interest' in defending the legality of the measure." *Prete*, 438 F.3d at 955 (citing *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 528 (9th Cir. 1983)); *see also Wash. State Bldg. & Const. Trades Counsel, AFL-CIO v. Spellman*, 684 F.2d 627, 630 (9th Cir. 1982) ("public interest group that sponsored the initiative was entitled to intervention as a matter of right under Rule 24(a)"). HSUS undeniably has a significant protectable interest in this case because it not only has expended substantial resources exposing and reducing the inhumane treatment of dogs in puppy-mills in general – the primary concern underlying the ordinance at issue – it was a supporter and proponent of the Ordinance. *Prete*, 438 F.3d at 955. HSUS assisted in drafting the language and expended resources supporting the effort to advocate for the Ordinance and to assist in its passage. Nienstedt Decl. at ¶¶ 6-8.

### 3. HSUS's Interests Will Be Impaired if Plaintiff Succeeds in Invalidating the Ordinance.

Intervention is also appropriate because disposition of this action "may as a practical matter impair or impede" HSUS's "ability to protect its interest." Fed. R. Civ. P. 24(a). Rule 24(a) does not require that the applicant's interest be actually or legally impaired, only that the applicant "be substantially affected in a practical sense." *Berg*, 268 F.3d at 822 (quotation omitted). Not surprisingly, the Ninth Circuit has consistently held that a decision invalidating an ordinance that a public interest group has supported and helped pass impairs that group's interest. *Sagebrush Rebellion*, 713 F.2d at 528 ("An adverse decision in this suit would impair the society's interest in the preservation of birds and their habitats."); *see also Idaho v. Freeman*, 625 F.2d 886 (9th Cir. 1980).

Puppies 'N Love's lawsuit threatens to undo the results of HSUS's extensive advocacy efforts. If the Court enjoins the Ordinance, HSUS's legal, staffing, and monetary commitments to the passage and preservation of the Ordinance would be nullified and their organizational interest in protecting animals will be adversely affected. Among other things, HSUS will be forced to continue devoting its resources monitoring the receipt and sale of animals in Phoenix from puppy mills, thereby detracting resources that could be served elsewhere.

Consequently, there is no question that if Puppies 'N Love's case is successful, disposition of the case will impair HSUS's interests. *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1398 (9th Cir. 1995) (finding impairment where action could lead to reversal of administrative decision actively supported by applicants for intervention).

### 4. HSUS's Interests Are Not Adequately Represented by Any of the Parties.

HSUS's interests diverge in important respects from those of the City, and thus are not sufficiently protected by the City's involvement. Specifically, although the City's interest is in the administration of their legal obligation on behalf of the general

public, HSUS has a narrower interest in advocating for prevention of cruelty to animals and the interests of the supporters of the Ordinance.

"The burden of showing inadequacy of representation is minimal and is satisfied if the applicant shows that the representation of its interests *may* be inadequate." *Prete*, 438 F.3d at 955 (citing *Sagebrush*, 713 F.2d at 528) (emphasis added). In assessing whether a present party will adequately represent an intervenor-applicant's interests, courts should "consider several factors, including whether [a present party] will undoubtedly make all of the intervenor's arguments, whether [a present party] is capable of and willing to make such arguments, and whether the intervenor offers a necessary element to the proceedings that would be neglected." *Id.* "The focus should be on the 'subject of the action,' not just the particular issues before the court at the time of the motion." *Berg*, 268 F.3d at 823 (citation omitted).

"Inadequate representation is most likely to be found when the applicant asserts a personal interest that does not belong to the general public." *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1499 (9th Cir. 1995) abrogated on other grounds by *Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011). Here, the City's interest is primarily in the administration of its legal obligations, as it is charged with enforcing and defending the laws enacted by the City Council on behalf of the public at large, including the dog breeding industry. It has no specific mandate to advocate for the humane treatment of animals, nor does it represent humane interests above others. The City's interests may also be motivated by unrelated factors, including financial, political, or other pressures. Ensuring the prohibition of egregious animal cruelty, on the other hand, is central to the mission of HSUS. Kahn Decl. at ¶ 2.

HSUS does not need to "anticipate specific differences in trial strategy" the City may employ. *Berg*, 268 F.3d at 823 (citation omitted). It is sufficient "to show that, because of the difference in interests, it is *likely* that [the City] will not advance the same arguments as" HSUS. *Id.* (emphasis added). There is a high likelihood that

City may not make all or the same arguments as HSUS in light of the diverging interests.  *See California ex rel. Lockyer v. U.S.*, 450 F.3d 436, 444 (9th Cir. 2006) ("We have recognized that willingness to suggest a limiting construction in defense of a statute is an important consideration in determining whether the government will adequately represent its constituents' interests.").

Moreover, HSUS offers extensive factual and legal knowledge regarding the concerns underlying the Ordinance being challenged that are not shared in full by the City.  Kahn Decl. at ¶ 4.  For example, HSUS has already spent considerable time and effort gathering information concerning the inhumane practices of various breeders across the country, including those known to supply dogs to the Puppies 'N Love in this case.  HSUS's knowledge and experience concerning the dog breeding industry will provide the Court and the parties with a better opportunity to evaluate and resolve Plaintiff's claims.

**B.     In the Alternative, the Court Should Grant HSUS Permissive Intervention.**

In the alternative, HSUS asks that this Court grant permissive intervention pursuant to Fed. R. Civ. P. 24(b).  A court may grant permissive intervention "where the applicant for intervention shows (1) independent grounds for jurisdiction; (2) the motion is timely; and (3) the applicant's claim or defense, and the main action, have a question of law or question of fact in common."  *U.S. v. Los Angeles*, 288 F.3d at 403 (citations omitted).  This Court has an independent ground for jurisdiction based on the federal questions in the complaint, and, as discussed above, HSUS's application is timely and will not prejudice the parties or cause any undue delay.  Most importantly, HSUS's potential defenses and the main action have more than a question of law or a question of fact in common.  HSUS's defenses are principally based on legal argument as to the insufficiency of the claims raised by Plaintiff.

5323176                                                              10

**III.   CONCLUSION**

For the foregoing reasons, HSUS respectfully requests that the Court grant its Motion to Intervene.

Dated this 14th day of February, 2014.

                                          OSBORN MALEDON, P.A.

By   s/ Brandon A. Hale
      Maureen Beyers
      Eric M. Fraser
      Brandon A. Hale
      2929 North Central Avenue, Suite 2100
      Phoenix, Arizona  85012-2793

Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on February 14, 2014, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the all CM/ECF registrants.

s/ Karen Willoughby

5323176

11