**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Puppies 'N Love, et al., | No. CV-14-00073-PHX-DGC |
| Plaintiffs, | **ORDER** |
| v. | |
| City of Phoenix, | |
| Defendant. | |

Defendant City of Phoenix has passed an ordinance regulating pet stores ("the Ordinance"). Under the Ordinance, pet stores may not sell dogs or cats obtained from persons or companies that breed animals. Pet stores may sell only animals obtained from animal shelters or rescue organizations. Puppies 'N Love operates a pet store in Phoenix that sells purebred dogs obtained from out-of-state breeders. Puppies 'N Love and its owners have sued the City, claiming primarily that the Ordinance violates the dormant Commerce Clause of the United States Constitution by closing the Phoenix market to out-of-state breeders and giving an economic advantage to local breeders. The parties, including Intervenor Humane Society of the United States ("HSUS"), have filed motions for summary judgment (Docs. 143, 147, 151), and the Court heard oral argument on July 10, 2015. For the reasons that follow, the Court will deny Plaintiffs' motion and grant the motions of the City and the HSUS.

///

## I.      Background.

### A.      Federal Regulation of Animal Breeders.

The federal government regulates the treatment of animals through the Animal Welfare Act ("AWA"), which sets standards for the treatment of certain animals that are bred for sale, exhibited to the public, used in biomedical research, or transported commercially.   *See* 7 U.S.C. §§ 2131-59.   As relevant here, the AWA regulates the activities of most breeders of dogs by requiring them to have a license before selling their animals.   9 C.F.R. § 2.1(a).   A breeder becomes eligible for a license by agreeing to follow specified standards for caring for animals.   *Id.* § 2.2(a).   These standards include housing dogs in appropriate enclosures (9 C.F.R. § 3.1), regularly exercising them (§ 3.8), feeding them once a day (§ 3.9), and reducing pest contamination in animal areas (§ 3.11).   The United States Department of Agriculture ("USDA") enforces the AWA by inspecting breeders and imposing penalties for violations.   7 U.S.C. §§ 2147, 2149.

Some believe that the AWA does not adequately protect dogs.   *See, e.g.*, Doc. 148-1 at 213-14.   They argue that lax enforcement and poor standards have led to a proliferation of "puppy mills" where dogs are bred in large numbers and inhumane conditions.   *See* Doc. 148 at 4-5.   The HSUS has stated that the "AWA allows dogs to be kept in cramped, wire-floored cages for their entire lives, churning out litter after litter of puppies for the commercial pet trade."   Doc. 137-23 at 5.   In 2010, the Inspector General of USDA similarly found that enforcement of the AWA "was ineffective in achieving dealer compliance with [the] AWA and regulations[.]"   Doc. 148-1 at 422.   The Inspector General reported that inspectors had found dogs cared for by USDA-licensed breeders that were walking on injured legs, suffering from tick-infestations, eating contaminated food, and living in unsanitary conditions.   *Id.* at 432-42.   Since 2010, the USDA has worked to improve enforcement of the AWA.   *See* Doc. 157-12 at 19-20.

### B.      The Ordinance.

Many states and municipalities have decided to impose stricter standards on animal breeders and pet stores.   *See* Doc. 157, ¶¶ 10-14.   Missouri, where a large number

of USDA-licensed breeders are located, requires breeders to keep dogs in large and impervious cages, provide regular opportunities for outdoor exercise, and provide comprehensive annual veterinary exams. *See* Mo. Rev. Stat. § 273.345; *see also* Doc. 137-1 at 16-18. Indiana, Iowa, Oklahoma, and Texas have passed similar laws. *See* Doc. 157, ¶¶ 10-14. Although not directly regulating animal breeders, Arizona has passed a law regulating retail pet stores. *See* A.R.S. §§ 44-1799 *et seq.* Under this law, pet stores must adequately care for their animals and ensure the good health of animals before selling them. *Id.*

In recent years, cities such as Austin, Chicago, Los Angeles, Miami, and San Diego have passed ordinances prohibiting pet stores from selling dogs obtained from certain types of breeders. *See* Krysten Kenny, *A Local Approach to A National Problem: Local Ordinances As A Means of Curbing Puppy Mill Production and Pet Overpopulation*, 75 Alb. L. Rev. 379, 379 (2012). The HSUS is a proponent of these ordinances. Doc. 137-23 at 5-12. The HSUS believes that because many pet shops sell dogs obtained from puppy mills, governments should limit pet shops to selling dogs obtained from animal shelters. *Id.* On December 18, 2013, with encouragement from the HSUS, Phoenix joined the other cities in passing a pet-store ordinance. Doc. 136-1 at 2-6. The Ordinance is entitled "[p]rohibition on sale of dogs or cats" and states:

> A. No pet shop or pet dealer shall display, sell, deliver, offer for sale, barter, auction, give away, broker or otherwise transfer or dispose of a dog or cat except for a dog or cat obtained from:
>
> 1. An animal shelter;
>
> 2. A private, nonprofit humane society or nonprofit animal rescue organization; or
>
> 3. An animal shelter, nonprofit humane society or nonprofit animal rescue organization that operates out of or in connection with a pet shop.
>
> * * *
>
> C. This section does not apply to:
>
> 1. A person or establishment, other than a pet shop or pet dealer, which displays, sells, delivers, offers for sale, barters, auctions, gives away, brokers or otherwise

transfers or disposes of only dogs and cats that were bred and reared on the premises of the person or establishment;

2.     An animal shelter;

3.     A private, nonprofit humane society or nonprofit animal rescue organization; or

4.     An animal shelter, nonprofit humane society or nonprofit animal rescue organization that operates out of or in connection with a pet shop.

D.     Nothing in this section shall prevent a pet shop or pet dealer from providing space and appropriate care for animals owned by an animal shelter, nonprofit humane society or nonprofit animal rescue agency and maintained at a pet shop for the purpose of adopting those animals to the public.

Doc. 136-1 at 2-6.[1]  The Ordinance also requires pet shops to maintain records "listing the source of all dogs or cats under their ownership, custody or control."  *Id.* at 5.

In sum, the Ordinance prevents pet shops from selling animals obtained from commercial breeders.  Pet shops may sell animals obtained only from shelters and rescue organizations.  Breeders and animal shelters within the City may, however, continue selling directly to customers.

**C.     City of Phoenix Pet Market.**

In Maricopa County, which encompasses Phoenix and other cities, the Maricopa County Animal Care and Control organization ("MCACC") shelters unwanted dogs and cats.  Doc. 148-1 at 241-42.  In 2014, MCACC took in 38,235 animals, almost 34,000 of which were dogs.  *Id.*; Doc. 157-42 at 5.  MCACC found new homes for 11,382 of these animals, euthanized 10,160, and returned 4,183 to their original owners.  Doc. 157-42 at 5.  MCACC also transferred 12,129 of these animals to other animal rescue organizations through its New Hope program.  Doc. 157-43 at 2.  Partners in the New Hope Program

---

[1] Under the Ordinance, an animal shelter is defined as "any establishment maintained by the Maricopa County Board of Supervisors or the City of Phoenix for the confinement and maintenance of dogs and other animals" as well as "any establishment maintained by a nonprofit organization for the relief of suffering of dogs and other animals . . . ."  Doc. 136-1 at 2-3.  A pet shop is "any establishment at which are kept for sale any animals generally considered to be household pets, but excluding kennels or livery stables."  *Id.* at 4.

include the Arizona Humane Society and the Arizona Animal Welfare League. Doc. 148-1 at 243.  MCACC and other rescue organizations believe that the Ordinance will reduce animal homelessness and result in more adoptions.  *Id.* at 245-47.

Many breeders located in the City of Phoenix offer pets for sale and often advertise through the internet.  Doc. 137-31 - 35.  Some of these breeders are commercial operations.  Others may be described as "backyard breeders" with little experience and low standards for dog breeding.  Doc. 152-1 at 17; Doc. 137-24 at 23.  Out-of-state breeders also sell dogs to Phoenix residents, either through the internet or local pet stores.  Almost all of these breeders believe that there are disadvantages in selling pets through the internet.  *See* Doc. 137-36 at 20, 25, 31, 35.  Not only are there costs associated with advertising on the internet, but sales can be difficult to make.  Customers may suspect that internet dealers are fraudulent.  *See id.* at 9-10, 16.  More importantly, customers want to interact with an animal before buying it as a pet.  *Id.* at 21, 26, 32, 36.  For that reason, out-of-state breeders rely on local pet stores like Puppies 'N Love to sell their dogs to Phoenix residents.  *Id.*  As one Arkansas breeder put it: "Without access to a local pet store in Phoenix, I would be unable to compete with local breeders, who would have preferential access to local residents by virtue of their physical location in or near the city."  *Id.* at 20.

**D.     Puppies 'N Love.**

The Ordinance will have a significant impact on Puppies 'N Love, which operates the only pet store in Phoenix that sells commercially-bred dogs.  Doc. 152-1 at 8-9; Doc. 137-6 at 9.  Puppies 'N Love sells purebred puppies to the public at the Paradise Valley Mall, as well as other locations outside of the City of Phoenix.  Doc. 137-6 at 28, 43.  The store advertises itself as promoting "the highest standards in animal welfare by committing ourselves 100% to the puppies in terms of their health, safety and well-being[.]"  *Id.* at 44.  Puppies 'N Love buys puppies from commercial breeders, almost all of which are located out-of-state.  Doc. 157, ¶ 134; Doc. 167-1 at 3.  Local breeders provide too few puppies and, according to the store's owners, lack the professionalism of

breeders from the Midwest.  *Id.* at 4.  The store sells approximately 500 puppies each year.  Doc. 152-1 at 32.

Puppies 'N Love asserts that it does not buy from puppy mills.  Doc. 137-6 at 28.  Rather, the store buys puppies only from USDA-licensed breeders and hobby breeders that have four or fewer breeding females.  *Id.*  If a breeder is reported to have one direct or three indirect violations of USDA standards, Puppies 'N Love states that it will not do business with that breeder.  *Id.*; Doc. 137, ¶ 14.  The store has a full-time employee who ensures that the breeders are "providing excellent and loving conditions in which dogs are bred and raised."  Doc. 137-6 at 28.

Despite these policies, Puppies 'N Love has done business with at least three breeders who have had direct violations of USDA standards.  Doc. 137, ¶ 21.  One of these breeders arguably is a prototypical puppy mill.  Doc. 148 at 6-12.  This breeder breeds female dogs every six to twelve months, keeps dogs in small enclosures without solid flooring, and has at most six employees to take care of approximately 700 dogs.  *Id.* at 6-7.  Although Puppies 'N Love disputes this characterization and argues that the breeder has a good business reputation (Doc. 157, ¶¶ 72-88), the store no longer buys from him and others who have directly violated USDA standards (Doc. 137, ¶¶ 21-22, Doc. 157-22 at 77).

Frank and Vicki Mineo own and operate Puppies 'N Love.  Doc. 137-6 at 28, 36.  Because Puppies 'N Love does not buy dogs from animal shelters, they believe that the Ordinance will force them to close their store in Phoenix.  *Id.* at 29-30, 37-38.  They considered the possibility of selling dogs from shelters, but found that it is not economically feasible.  *Id.* at 30.  They believe that they could not compete on a for-profit basis with subsidized shelters and humane societies that provide the same dogs for free or a minimal price.  *Id.* at 29; Doc. 11-1 at 13.  The Mineos and Puppies 'N Love therefore brought suit against the City, claiming that the Ordinance violates the dormant Commerce Clause, the Equal Protection Clause, and the Arizona Constitution's prohibition on special laws.  Doc. 1.  They also claim that the Ordinance is preempted by

1    A.R.S. § 44-1799 and is unconstitutionally vague.[2]   The HSUS subsequently was

2    permitted to enter the case as an intervenor.  Doc. 37.

3         On April 2, 2014, the Court granted Plaintiffs' request for a preliminary

4    injunction.  Doc. 41.  The Court found that the balance of hardships tipped sharply in

5    Plaintiffs' favor and that the existence of serious merits questions warranted preliminary

6    injunctive relief.  *Id.* (citing *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

7    1135 (9th Cir. 2011)).

8    **II.   Interpretation of the Ordinance.**

9         The Ordinance is not a model of clarity.  It states that "pet shops" may sell only

10   animals obtained from animal shelters and nonprofit rescue organizations.  *Id.* at 5.  This

11   much is clear, but the Ordinance's exception for breeders is less so.  It provides that "[a]

12   person or establishment, other than a pet shop or pet dealer," may sell "dogs and cats that

13   were bred and reared on the premises of the person or establishment."  *Id.* at 5-6.  But if a

14   person or establishment sells dogs and cats that are kept on-site, then that person or

15   establishment would fall within the Ordinance's definition of a pet shop: "any

16   establishment at which are kept for sale any animals generally considered to be

17   household pets, but excluding kennels or livery stables."  Doc. 136-1 at 4.  Thus, the

18   breeder exception – that "a person or establishment, *other than a pet shop*," may sell dogs

19   and cats that are bred onsite – could be viewed as meaningless because the instant a

20   person or establishment sells dogs and cats that are kept on-site it becomes a pet shop not

21   allowed to sell these animals.  The only meaningful reading of these provisions is that

22   establishments selling dogs and cats that are bred on-site are breeders, regardless of the

23   definition of pet shop, and may sell the animals.  Otherwise, the exemption for breeders

24   would be meaningless, an interpretation the Court should avoid.  *See Mejak v. Granville*,

25   136 P.3d 874, 876 (Ariz. 2006) ("[Courts] must interpret the statute so that no provision

27   _____

28   [2] Plaintiffs appear to have abandoned their claim that the Ordinance is void for vagueness.  They seek summary judgment on all the claims listed in their complaint except their vagueness claim, which they do not discuss.  *See* Doc. 108, ¶¶ 38-78.  The Court will assume that Plaintiffs have abandoned this claim.

1  is rendered meaningless, insignificant, or void.").

2  **III.  Legal Standards.**

3      **A.  Summary Judgment.**

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When presented with cross-motions for summary judgment, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).

      **B.  Dormant Commerce Clause.**

The Commerce Clause grants Congress the power to "regulate Commerce . . . among the several States[.]" U.S. Const. art. I, § 8, cl. 3. The Clause also contains a "'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.*, 511 U.S. 93, 98 (1994). This negative aspect has come to be known as the "dormant Commerce Clause." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337 (2008). Courts "analyze dormant Commerce Clause claims using the Supreme Court's two-tiered approach." *Pharm. Research & Mfrs. of Am. v. Cnty. of Alameda*, 768 F.3d 1037, 1041 (9th Cir. 2014). "The first tier asks whether the Ordinance 'either discriminates against or directly regulates interstate commerce.'" *Id.* (quoting *Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d

414, 432 (9th Cir. 2014)).  If so, the Ordinance is subject to strict scrutiny – a "virtually *per se* rule of invalidity[.]"  *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978).  The second tier has come to be known as the *Pike* balancing test.  *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  Under *Pike*, the Court asks whether the burden the Ordinance imposes on interstate commerce is "clearly excessive in relation to the putative local benefits."  *Id.*

The restraints of the dormant Commerce Clause do not apply when a "local government enters the market as a participant," *White v. Mass. Council of Const. Employers, Inc.*, 460 U.S. 204, 208 (1983), or Congress has authorized "regulations that burden or discriminate against interstate commerce," *Hillside Dairy Inc. v. Lyons*, 539 U.S. 59, 66 (2003).

**IV.    Dormant Commerce Clause Analysis.**

Plaintiffs argue that the Ordinance directly regulates interstate commerce, discriminates against interstate commerce by its effect and purpose, and unduly burdens interstate commerce.  Plaintiffs' reasoning relies not on the Ordinance's effect on local pet shops, but on the fact that it bars out-of-state breeders from selling animals through pet shops in the City of Phoenix.  Plaintiffs assert that the practical effect of this bar is to grant an advantage to local breeders and impose a disadvantage on out-of-state breeders in the sale of puppies.[3]  The City and HSUS dispute Plaintiffs' various arguments about the effect of the Ordinance.  They also argue that the dormant Commerce Clause does not apply to the Ordinance because Congress has allowed local governments to burden interstate commerce when regulating animal welfare, and because the City itself is a participant in the relevant market.  The Court will begin with these last two arguments.

---

[3] Although not raised by the parties, the Court notes that Plaintiffs have standing to base their argument on the interests of out-of-state breeders.  "[C]ognizable injury from unconstitutional discrimination against interstate commerce does not stop at members of the class against whom a State ultimately discriminates, and customers of that class may also be injured[.]"  *Gen. Motors Corp.*, 519 U.S. at 286.  Here, Puppies 'N Love is a customer of out-of-state breeders.  The store has suffered an injury because it is no longer able to sell dogs obtained from out-of-state breeders, against whom the Ordinance allegedly discriminates.

**A.      Congressional Authorization of Local Regulations.**

The City argues that even if the Ordinance discriminates against interstate commerce, the AWA permits the City to discriminate.  As already noted, the AWA sets standards for the humane care and treatment of certain animals that are bred for sale, exhibited to the public, used in research, or transported commercially.  *See* 7 U.S.C. §§ 2131-59.   When passing and amending the AWA, Congress envisioned the cooperation of federal and state officials "in carrying out the purposes of this chapter and of any State, local, or municipal legislation or ordinance on the same subject."  *Id.* § 2145(b).  The AWA contains a subsection that requires the Secretary of Agriculture to "promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors."  *Id.* § 2143(a)(1).  In a savings clause, the AWA clarifies that this subsection – § 2143(a)(1) – "shall not prohibit any State (or a political subdivision of such State) from promulgating standards in addition to those standards promulgated by the Secretary under [§ 2143(a)(1)]."  *Id.* § 2143(a)(8).  Under this provision, a state or municipality may "promulgate standards" regarding the "handling, care, treatment, and transportation" of animals, and presumably those standards may be more restrictive than standards promulgated by the Secretary of Agriculture.

The City argues that the savings clause expresses a congressional intent to authorize local regulations of the sale of pets, even if those regulations discriminate against interstate commerce.   Although it is true that Congress "has the power to authorize state regulations that burden or discriminate against interstate commerce," courts "will not assume that it has done so unless such an intent is clearly expressed." *Hillside Dairy*, 539 U.S. at 66 (2003) (citations omitted).  A court may exempt a local law from the requirements of the dormant Commerce Clause "only when the congressional direction to do so has been 'unmistakably clear,'" *Maine v. Taylor*, 477 U.S. 131, 139 (1986) (quoting *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91 (1984)), and the defendant has demonstrated "a clear and unambiguous intent on

behalf of Congress to permit the discrimination against interstate commerce," *Wyoming v. Oklahoma*, 502 U.S. 437, 458 (1992).

The AWA's savings clause does not clearly and unambiguously authorize Phoenix to enact an ordinance that discriminates against interstate commerce.  It provides that the City may adopt standards for the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors, but it does not explicitly say that the City may enact an ordinance that discriminates against out-of-state breeders in purpose or effect.  The City argues that the Court should give the savings clause a "broad interpretation" (Doc. 151 at 10), but the Supreme Court has made clear that a broad interpretation is not permitted.  Courts may not find that Congress has authorized local laws that discriminate against interstate commerce unless Congress's intent is "clearly expressed," *Hillside Dairy*, 539 U.S. at 66, "unmistakably clear," *Maine*, 477 U.S. at 139, and "clear and unambiguous," *Wyoming*, 502 U.S. at 458.  The savings clause does not meet this exacting standard.

The clause says nothing about interstate commerce.  It provides that another provision, § 2143(a)(1), does not "prohibit" states and local governments from promulgating standards.  7 U.S.C. § 2143(a)(8).  This appears to be a clear indication that § 2143(a)(1)'s grant of standard-making authority to the Secretary of Agriculture does not preempt state or local standards that go beyond the Secretary's standards.  But saying that the statute does not prohibit such additional standards is not the same as saying that the dormant Commerce Clause does not prohibit burdens on interstate commerce.  The savings clause speaks only about the effect of § 2143(a)(1); it says nothing about any other provision of law.  It certainly is not an unmistakably clear statement that the dormant Commerce Clause – a different provision of law – does not bar local laws that discriminate against interstate commerce.

In only a few instances has the Supreme Court found congressional authorization of discrimination against interstate commerce.  For example, the Court found that the following statutory language approved discrimination:

- "The Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States." *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 429 (1946) (quoting the McCarran Act).

- "Nothing in this Act or any other provision of law shall be construed to preempt, prohibit, or otherwise limit the authority of the State of California, directly or indirectly, to establish or continue to effect any law, regulation, or requirement regarding [milk products]." *Hillside Dairy*, 539 U.S. at 65-66 (quoting Federal Agriculture Improvement and Reform Act).

In contrast, the Court construed the following language as not approving discrimination:

- "[N]othing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation." *Sporhase v. Nebraska, ex rel. Douglas*, 458 U.S. 941, 959-60 (1982) (quoting Reclamation Act).

- "[The Federal Power Act] shall not . . . deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line." *New England Power Co. v. New Hampshire*, 455 U.S. 331, 341 (1982).

- "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." *Granholm v. Heald*, 544 U.S. 460, 487 (2005) (quoting Twenty-First Amendment).

Although the distinction is not crystal clear, these comparisons suggest that congressional authorization to discriminate exists when a federal law quite clearly disavows the dormant Commerce Clause (*Prudential*) or provides that nothing in any provision of law "either directly or indirectly" limits the states' authority to regulate an aspect of commerce (*Hillside Dairy*). In contrast, authorization to discriminate does not exist when a federal law merely clarifies that it does not preempt state law or deprive a state of its existing authority, or when it expressly recognizes laws enacted by the states (*Sporhase*, *New England Power*, *Granholm*). The AWA's savings clause aligns more closely with the latter category of cases.[4]

---

[4] The City cites two district court cases that have found that the AWA's savings clause authorized discrimination against interstate commerce. *Maryeli's Lovely Pets, Inc. v. City of Sunrise*, No. 81:14-CV-61391-Scola (S.D. Fla. June 24, 2015); *Zimmerman v.*

1    The City highlights the AWA's opening policy statement in which Congress

2    declares that (1) the regulation of animals is necessary "to prevent and eliminate burdens"

3    upon interstate commerce, and (2) "it is essential" to regulate the sale of animals as pets.

4    *Id.* § 2131.  The Court fails to see how these statements – which identify the basis for

5    Congress's action under the Commerce Clause – show that Congress intended to

6    authorize local discrimination.  Indeed, Congress's declaration that the regulation of

7    animals is necessary "to prevent and eliminate burdens" upon interstate commerce

8    suggests that Congress did not desire local governments to regulate animals in a way that

9    would burden interstate commerce.

10   **B.     City as a Market Participant.**

11   The City next argues that the Ordinance is exempt from Commerce Clause

12   scrutiny because the City was acting as a market participant when it passed the

13   Ordinance.  "Nothing in the purposes animating the Commerce Clause prohibits a State,

14   in the absence of congressional action, from participating in the market and exercising the

15   right to favor its own citizens over others."  *Hughes v. Alexandria Scrap Corp.*, 426 U.S.

16   794, 810 (1976).  "[I]f a State is acting as a market participant, rather than as a market

17   regulator, the dormant Commerce Clause places no limitation on its activities."  *South-*

18   *Central Timber Dev.*, 467 U.S. at 93 (plurality).[5]

19   The critical inquiry is "'whether the challenged program constitute[s] direct state

20   participation in the market.'"  *White*, 460 U.S. at 208 (quoting *Reeves, Inc. v. Stake*, 447

21   U.S. 429, 435 n.7 (1980) (internal quotations omitted)).  The Supreme Court has applied

23   *Wolff*, 622 F. Supp. 2d 240, 245 (E.D. Pa. 2008).  Both cases analyze the issue only
24   briefly, and the Court finds them unpersuasive.  They do not cite or discuss the Supreme
     Court's instruction that congressional authorization of discrimination must be
25   unmistakably clear.

26   [5] When the market-participant exception applies, the law is unsettled as to whether
     further commerce-clause analysis is necessary.  The Supreme Court has stated that "when
27   a state or local government enters the market as a participant it is not subject to the
     restraints of the Commerce Clause."  *White*, 460 U.S. at 208.  But in *United Haulers*, 550
     U.S. 330, a plurality of the Court engaged in *Pike* balancing after finding that the
28   government was acting as a market participant.  Because the Ordinance does not fall
     under the market-participant exception, the Court need not attempt to resolve this issue.

- 13 -

the market-participant exception where a state operated a cement plant and restricted the sale of the plant's cement to in-state purchasers (*Reeves*); where a city required all city-funded construction projects to be performed by crews that included city residents (*White*); and where counties established a waste-processing facility and required all solid waste generated within the counties to be delivered to that facility (*United Haulers*).

The Court is unable to discern, nor does the City adequately explain, how the market-participant exception applies to this case.  The City emphasizes that, through its financial support for MCACC and in other ways, the City participates in the market of rescuing and adopting out homeless animals.  This may be true, and the Ordinance may benefit the City's participation in parts of that market, but in attempting to re-configure the market for pets the City is acting as a market regulator, not as a market participant.  The City has not adopted a policy that it, as a market participant, will do business only with certain pet shops.  It has not stipulated that pet shops within the City must buy animals solely from City-sponsored operations.  The Ordinance reaches more broadly, driving private pet shops like Puppies 'N Love out of business regardless of whether they do business with the City and potentially benefiting non-governmental animal shelters and private breeders alike.  Thus, this case is not like *Reeves*, where a state operated a cement plant and restricted the sale of its cement to in-state purchasers, or *White*, where a city required all city-funded construction projects to be performed substantially by city residents, or *United Haulers*, where the counties re-directed all solid-waste business to a government facility.  The City has failed to point to a case where a court has applied the market-participant exception to a local law that regulated private businesses in a way that arguably benefitted both government entities and local businesses.  The Court will not apply the market-participant exception here.

### C.     Extraterritorial Regulation.

The dormant Commerce Clause precludes "extraterritorial" regulation of commerce, that is, "the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State."

- 14 -

*Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982) (plurality).  "[A] statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature."  *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989).  "The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State."  *Id.* (citing *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986)).[6]

Plaintiffs argue that the Ordinance regulates conduct occurring outside of the City. Specifically, Plaintiffs argue that the City is attempting "to do indirectly what it lacked authority to do directly – that is, change regulatory standards in other jurisdictions by restricting access to its own local market."  Doc. 143 at 18.

The Court is not persuaded.  Plaintiffs would have a better argument if the Ordinance provided that out-of-state breeders may sell to Phoenix pet shops only if they change their business to conform to the City's standards.  The Ordinance does not do that.  It instead prohibits the sale of commercially-bred animals in local pet stores regardless of the conditions under which they were bred or the regulations of their local jurisdictions.  Because out-of-state breeders and their governing cities and states can do nothing to gain access to Phoenix pet shops, the Ordinance is not an attempt to change their conduct.  Plaintiffs have not shown that "the practical effect of the regulation is to control conduct beyond the boundaries of the [City]."  *Healy*, 491 U.S. at 336.

### D.    Discrimination Against Interstate Commerce.

"The principal objects of dormant Commerce Clause scrutiny are statutes that discriminate against interstate commerce."  *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 87 (1987).  A law "'can discriminate against out-of-state interests in three different ways: (a) facially, (b) purposefully, or (c) in practical effect.'"  *Nat'l Ass'n of*

---

[6] These principles of law have been criticized, *Healy*, 491 U.S. at 345 (Scalia, J., concurring), and "[i]n the modern era . . . the Supreme Court has rarely held that statutes violate the extraterritoriality doctrine," *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1101 (9th Cir. 2013).

*Optometrists & Opticians v. Brown* (*Nat'l Ass'n of Optometrists I*), 567 F.3d 521, 525 (9th Cir. 2009) (quoting *LensCrafters, Inc. v. Robinson*, 403 F.3d 798, 802 (6th Cir. 2005)).  "The party challenging the statute bears the burden of showing discrimination." *Black Star Farms, LLC v. Oliver*, 600 F.3d 1225, 1230 (9th Cir. 2010).  A law discriminates against interstate commerce when it gives differential treatment to similarly situated "in-state and out-of-state economic interests" in a way "that benefits the former and burdens the latter."  *Oregon Waste Sys.*, 511 U.S. at 99.  "[A]ny notion of discrimination assumes a comparison of substantially similar entities."  *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997).  Once a state law is shown to discriminate, the burden falls on the state to show that it had "no other means to advance a legitimate local purpose."  *United Haulers*, 550 U.S. at 338-39.  This is a form of strict scrutiny, a "virtually *per se* rule of invalidity[.]"  *City of Philadelphia*, 437 U.S. at 624.

Plaintiffs do not contend that the Ordinance is facially discriminatory.  On its face, the Ordinance treats in-state and out-of-state breeders the same – none of them can sell to Phoenix pet stores.  Plaintiffs do assert that the Ordinance discriminates in effect and purpose.  The Court will consider these alleged forms of discrimination separately.

### 1.      Does the Ordinance Discriminate in Effect?

#### a.      Analytical Framework.

Although the general principles for identifying practical-effect discrimination are rather easily stated, they are difficult to apply.  Supreme Court cases considering whether laws have the effect of discriminating against interstate commerce have produced a wide variety of results, and the language of these cases at times appears inconsistent.  Justice Scalia has observed that "once one gets beyond facial discrimination our negative-Commerce-Clause jurisprudence becomes (and long has been) a quagmire."  *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 210 (1994) (Scalia, J., concurring) (internal quotation marks omitted).  As another commentator has noted, the Supreme Court "never has articulated clear criteria for deciding when proof of a discriminatory purpose and/or effect is sufficient for a state or local law to be discriminatory.  Indeed, the cases in this

area seem quite inconsistent."   E. Chemerinsky, *Constitutional Law, Principles and Policies* 444-45 (4th ed. 2011).

The central question is whether Plaintiffs have shown that the effect of the Ordinance is to burden out-of-state breeders and benefit in-state breeders.  Plaintiffs must bring "'substantial evidence of an actual discriminatory effect[.]'"  *Black Star*, 600 F.3d at 1231 (quoting *Black Star Farms, LLC v. Oliver*, 544 F. Supp. 2d 913, 928 (D. Ariz. 2008)).  An incidental burden on out-of-state interests and a "*de minimis* benefit" to local interests is "insufficient to trigger strict scrutiny."  *Id.* at 1235.  "Courts examining a 'practical effect' challenge must be reluctant to invalidate a state statutory scheme . . . simply because it *might* turn out down the road to be at odds with our constitutional prohibition against state laws that discriminate against Interstate Commerce."  *Id.* at 1232 (emphasis in original).  Furthermore, "[t]he fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce."  *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 126 (1978).  Rather, Plaintiff must show that "the effect of [the] regulation is to cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market."  *Id.* at 126 n.16.

In demonstrating a discriminatory effect, Plaintiff must also show that the Ordinance has differing effects on similarly situated in-state and out-of-state entities. *Gen. Motors*, 519 U.S. at 298.  The only similarly situated entities in this case are local breeders and out-of-state breeders, both of which breed and sell dogs.  Plaintiffs argue that local animal shelters and rescue organizations are also similarly situated because they typically charge a price for the animals they offer to the public, and some take in dogs from other states.  *See* Doc. 157, ¶¶ 140-48.  But these organizations do not breed new dogs or operate on a for-profit basis as do breeders.  Although these organizations may compete in the same market, this does not make them similarly situated to out-of-state breeders.  *See Nat'l Ass'n of Optometrists I*, 567 F.3d at 525-26 ("The Court [in *General Motors*] acknowledged that local utility companies and independent out-of-state natural

gas marketers competed or wished to compete in one of the same markets, but still concluded that they were not similarly situated, and there was thus no discriminatory effect.") (citing *Gen. Motors*, 519 U.S. at 302-10).  The Court will therefore confine its analysis to the effects of the Ordinance on local and out-of-state breeders.

The Court also restricts its analysis to the effects of the Ordinance within the boundaries of the City of Phoenix.  The Supreme Court has instructed that "a State (or one of its political subdivisions) may not avoid the strictures of the Commerce Clause by curtailing the movement of articles of commerce through subdivisions of the State, rather than through the State itself."  *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Res.*, 504 U.S. 353, 361 (1992); *see also BFI Med. Waste Sys. v. Whatcom Cnty.*, 983 F.2d 911, 913 (9th Cir. 1993) ("[L]aws that discriminate against out-of-state business interests are *per se* unconstitutional even if it is a county rather than the state itself that discriminates[.]").  Thus, "discrimination is appropriately assessed with reference to the specific subdivision in which applicable laws reveal differential treatment."  *Associated Indus. of Missouri v. Lohman*, 511 U.S. 641, 650 (1994).

### b.    The Effects of the Ordinance.

The crux of Plaintiff's discriminatory-effect argument is as follows.  Under the Ordinance, no breeder is allowed to sell its animals through retail pet stores, but every breeder is allowed to sell its animals directly to the public.  Most customers like to see and interact with an animal before buying it as a pet.  Because an out-of-state breeder is unable under the Ordinance to sell its animals through pet stores, customers can interact with that breeder's animals only by travelling across state-lines to the breeder's location.  The effect of this, Plaintiffs argue, is to impose a competitive disadvantage *vis-à-vis* local breeders because customers seeking to interact with commercially-bred pets are more likely to visit a local breeder that is closer.  The primary means for out-of-state breeders to offset this advantage was to sell their animals through local pet stores.  Because the Ordinance closes off this distribution channel, Plaintiffs reason, consumers within the city will buy fewer dogs from out-of-state breeders and more dogs from local breeders.

Although Plaintiffs' argument has logical appeal, the Court ultimately concludes that Plaintiffs have failed to present evidence with which they could carry their burden of proof at trial.  As noted above, "[t]he party challenging the statute bears the burden of showing discrimination."  *Black Star*, 600 F.3d at 1230.  Discrimination occurs when a law treats similarly situated "in-state and out-of-state economic interests" in a way "that benefits the former and burdens the latter."  *Oregon Waste Sys.*, 511 U.S. at 99.  And these benefits and burdens must be more than *de minimis*.  *Black Star*, 600 F.3d at 1235.  Thus, to avoid summary judgment on their Commerce Clause discriminatory effects claim, Plaintiffs must present sufficient evidence for a reasonable factfinder to conclude that the Ordinance will confer more than *de minimis* benefits on local breeders and impose more than *de minimis* burdens on out-of-state breeders.  Plaintiffs have failed to do so.

First, Plaintiffs have demonstrated no more than an incidental or *de minimis* burden on out-of-state breeders.  Plaintiffs have proffered numerous affidavits of such breeders.  These affidavits show that the effect of the Ordinance will be to impede out-of-state breeders' ability to sell their dogs in the Phoenix market.  The breeders state that "[w]ithout access to a local pet store in Phoenix I would be unable to compete with local breeders" because the only practical way for Phoenix residents to "see and play with a prospective pet" from an out-of-state breeder is for them to visit a local pet store.  *See, e.g.*, Doc. 137-36 at 20, 25, 31, 35.  Furthermore, the affidavits state that selling over the internet is not the equivalent of selling dogs through a local pet store.  As one breeder explained, "consumers would much prefer to see and play with their puppy before they buy.  People are wary of buying a puppy sight unseen over the internet.  The potential for fraud is too high, and there is no way for consumers to know for sure that they are purchasing a healthy, quality puppy."  *Id.* at 41.  And several breeders affirm that "[a]dopting an internet sales model would require me to completely change how I do business and would require the expenditure of substantial sums to set up and run a website, hire retail staff, and market to consumers in Arizona."  *Id.* at 21, 26, 32, 36.

The problem with this evidence is that it does nothing to establish the magnitude of the Ordinance's burden on out-of-state breeders.  True, it suggests that some breeders will lose their Phoenix sales, but the mere "fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce."  *Exxon Corp.*, 437 U.S. at 126.  To establish a discriminatory effect, Plaintiff must show that the Ordinance will create more than an incidental burden on interstate commerce.  Plaintiff has come forward with no evidence proving such a burden.

The undisputed evidence is that Puppies 'N Love sells approximately 500 dogs a year.  Doc. 137, ¶ 67; Doc. 152-1 at 32.  Almost all of these dogs are obtained from out-of-state breeders.  Doc. 167-1 at 3.  Even if out-of-state breeders were unable to sell these dogs through other Arizona pet stores, Plaintiff has not shown that this is a substantial or significant burden on interstate commerce.  Indeed, Plaintiffs have provided no evidence from which a factfinder could determine whether this effect on out-of-state breeders would be substantial or *de minimis*.

Based on the number of puppies that were licensed in Maricopa County, Defendant's expert has estimated Puppies 'N Love's share of the local puppy market. Doc. 152-1 at 32.  The expert estimates that the 500 dogs sold annually through Puppies 'N Love's Phoenix store constitutes just 2.2% of the total dog market in Maricopa County and 1.2% of the dog market in Arizona.  *Id.*  Plaintiff does not dispute this point. Doc. 152, ¶ 8; Doc. 157 at 27.  Admittedly, this is an imperfect comparison because it includes dogs sold by entities other than commercial breeders.  But it is at least one data point from which to assess the magnitude of 500 sales, and Plaintiffs provide no other. They do not provide evidence concerning the number of commercially bred dogs sold each year in Phoenix or nationwide.  Nor do they provide evidence showing what the loss of 500 Phoenix sales would mean to the out-of-state breeders from whom they obtained affidavits.  The Court – and a factfinder at trial – is left with no means of determining whether the loss of 500 sales is significant or merely incidental.

1    The same is true with respect to the benefits conferred by the Ordinance on local

2    breeders.  Those breeders will not necessarily be making 500 more sales each year as a

3    result of the Ordinance.  A Phoenix resident who is no longer able to buy a dog from the

4    Puppies 'N Love store in Phoenix might make a number of decisions.  She might adopt a

5    puppy from a local animal shelter or humane society, travel to a pet store located a few

6    miles away in one of the many neighboring cities in the greater Phoenix area, or decide

7    not to buy a puppy at all.[7]  None of these decisions would benefit breeders located within

8    the City of Phoenix – the persons who are similarly situated to out-of-state breeders.

9    Plaintiffs do argue that the Ordinance creates a competitive advantage for local

10   breeders because they do not have to compete with out-of-state breeders selling through a

11   nearby pet store.  But an abstract competitive advantage for in-state businesses is not

12   discrimination under the dormant Commerce Clause.  Rather, Plaintiff must present

13   evidence from which a reasonable factfinder could conclude that the effect of the

14   Ordinance will be to confer more than a *de minimis* benefit on local breeders.  In addition

15   to providing no evidence from which to quantify in any reasonable degree the number of

16   sales that will be gained by local breeders under the Ordinance, Plaintiffs have failed to

17   present evidence from which a jury could determine whether that benefit is more than *de*

18   *minimis* when compared to the total volume of business done by local breeders.  Plaintiffs

19   present no evidence of that volume.[8]  The Court thus finds that Plaintiffs have failed to

20   present evidence that would satisfy their burden of proof at trial.

21              **c.      *De Minimis* Rule.**

22   Plaintiffs argue that there is no *de minimis* exception to the dormant Commerce

23   Clause.  This argument is foreclosed by the Ninth Circuit.  In *Black Star*, the Ninth

24   _____

25       [7] As Defendant's expert notes, a Phoenix resident might be more likely to do one
     of these things than visit a local breeder.  For many Phoenix residents, travelling to a
26   local breeder would take longer than travelling to a pet store outside of the City of
     Phoenix.  Doc. 152-1 at 34.
27
         [8] Plaintiffs' expert opines that the Ordinance will result in a diversion of sales to
28   local breeders and shelters, but he does not attempt to quantify the extent of that benefit.
     Doc. 137-38 at 20.

Circuit considered a state law that allowed wineries, wherever located, to ship two cases of wine per year directly to consumers, so long as the consumers were physically present at the wineries when they purchased the wine.  600 F.3d at 1228.  Out-of-state wineries argued – no doubt with the same logical appeal that Plaintiffs present here – that the law gave an unfair advantage to in-state wineries because customers were likely to visit those wineries in person, but unlikely to visit out-of-state wineries.  In rejecting this argument, the Ninth Circuit held that "potential" harm to interstate commerce is not enough to trigger strict scrutiny under the dormant Commerce Clause, and that "[a] de minimis benefit to in-state wineries is also insufficient to trigger strict scrutiny."  *Id.* at 1235.

Thus, the law of this Circuit appears to be that *de minimis* effects on interstate commerce are not discriminatory.  Other courts apply the same rule.  *See Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28, 38 (1st Cir. 2007) (rejecting argument that *de minimis* effects on commerce trigger strict scrutiny); *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200, 216 (2d Cir. 2003) (finding a "de minimis advantage to in-state [companies] . . . insufficient to establish a discriminatory effect"); *Int'l Franchise Ass'n, Inc. v. City of Seattle*, No. C14-848 RAJ, 2015 WL 1221490, at *10 (W.D. Wash. Mar. 17, 2015) (same).

The Court finds this *de minimis* rule to be appropriate for several reasons.  First, it appears to be the law of this Circuit.  Second, it respects the sovereignty and power of local governments, leaving room for them to regulate on matters of legitimate local concern in ways that do not significantly burden interstate commerce.  Indeed, the Supreme Court has observed that "the States retain 'broad power' to legislate protection for their citizens in matters of local concern such as public health, and . . . not every exercise of local power is invalid merely because it affects in some way the flow of commerce between the States."  *Great Atl. & Pac. Tea Co. v. Cottrell*, 424 U.S. 366, 371 (1976) (citations omitted).  Third, as one court has noted, "[w]ere we to require no showing beyond the de minimis level, no distinction would exist between the discriminatory effect test and the incidental burden test employed by the Supreme Court

in *Pike*." *Cherry Hill Vineyard*, 505 F.3d at 38-39.  The *Pike* balancing test would become a nullity if the incidental effect required for *Pike* to apply were sufficient to trigger strict scrutiny.

Supreme Court cases do contain language suggesting that the extent of the burden on interstate commerce does not matter in dormant Commerce Clause analysis.  For example, the Court has stated that "[t]he volume of commerce affected measures only the *extent* of the discrimination; it is of no relevance to the determination whether a State has discriminated against interstate commerce."  *Wyoming*, 502 U.S. at 455 (emphasis in original).  But this statement concerned a facially discriminatory law, and it makes sense that a facially discriminatory law would be deemed invalid without an examination of its effects.  *See New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 276 (1988) ("Our cases . . . indicate that where discrimination is patent, as it is here, neither a widespread advantage to in-state interests nor a widespread disadvantage to out-of-state competitors need be shown."); *Cherry Hill Vineyard*, 505 F.3d at 38 ("It strikes us as implausible that the same de minimis standard would apply when evaluating whether a facially neutral statute has a discriminatory effect on interstate commerce.").[9]  When the very existence of discrimination turns upon the local law's effect on commerce, requiring more than a *de minimis* effect comports with the deference that should be accorded local laws and the existence of the *Pike* balancing test.

The Court recognizes that some Supreme Court cases have struck down local laws as discriminatory in effect without expressly addressing the extent of laws' effect on commerce.  But these cases involved laws that in effect created an embargo on out-of-state goods or services.  *See, e.g.*, *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383 (1994) (invalidating law that allowed only one local company to process and

---

[9] This is what distinguishes *Granholm*, 544 U.S. 460, on which Plaintiffs also rely. In *Granholm*, the Court invalidated laws that allowed in-state wineries to ship wine directly to in-state customers and prevented out-of-state wineries from so doing.  If the Ordinance here had allowed local breeders but not out-of-state breeders to sell their dogs through pet shops, then *Granholm* would be on point.  But that is not the case.  The Ordinance prevents all breeders from selling through pet shops and therefore is more similar to the law upheld in *Black Star*.

separate waste); *City of Philadelphia*, 437 U.S. 617 (invalidating law that prohibited the importation of waste from other states).  They also include cases where a significant effect on commerce was apparent to the Court.  For instance, *Dean Milk Company v. City of Madison*, 340 U.S. 349 (1951), invalidated a local ordinance requiring all pasteurized milk sold in the city to be processed and bottled at pasteurization plants located within five miles of the city.  *Dean Milk* did not expressly evaluate the extent to which the ordinance would burden out-of-state milk producers and benefit local producers, but it had little difficulty in finding the ordinance discriminatory: "[T]his regulation . . . in practical effect excludes from distribution in Madison wholesome milk produced and pasteurized [elsewhere]. . . .  In thus erecting an economic barrier *protecting a major local industry against competition from without the State*, Madison plainly discriminates against interstate commerce."  *Id.* at 354 (emphasis added).

As already noted, dormant Commerce Clause cases are not entirely clear or consistent.  But the Court concludes that these Supreme Court cases – which can be explained either as addressing facially discriminatory laws or effective embargoes in significant industries – are not inconsistent with the *de minimis* rule adopted by the Ninth Circuit and applied in this case.[10]

### d.  Conclusion.

In sum, the Court concludes that more than a *de minimis* effect must be shown to prove that a local law has the effect of discriminating against interstate commerce, invoking strict scrutiny.  Plaintiffs have not presented evidence that would allow a factfinder to find such an effect.  The Court will enter summary judgment against Plaintiffs' claim that the Ordinance has a discriminatory effect on interstate commerce.

---

[10] Plaintiffs also rely heavily on *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333 (1977), where the Supreme Court invalidated a North Carolina law that required all apple containers sold in the state to bear a single grade rather than the grades established by their states of origin.  As another court has amply explained, the facts in *Hunt* make clear that the effect on interstate commerce was substantial.  *See Int'l Franchise Ass'n, Inc.*, 2015 WL 1221490, at *12-13.  And the Court in *Hunt* also noted that "not every exercise of state authority imposing some burden on the free flow of commerce is invalid."  *Hunt*, 432 U.S. at 349.

## 2.    Does the Ordinance Discriminate in Purpose?

Plaintiffs also argue that the Ordinance was passed with the discriminatory purpose of favoring local over out-of-state breeders.  The Supreme Court has stated that a "'finding that state legislation constitutes 'economic protectionism' may be made on the basis of . . . discriminatory purpose[.]'"  *Chem. Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 344 n.6 (1992) (quoting *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984)); *see also Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471 n.15 (1981).  And the Supreme Court has found in several cases that a law had both a discriminatory purpose and a discriminatory effect.  *See, e.g.*, *W. Lynn Creamery*, 512 U.S. at 194 (finding a law's "avowed purpose and its undisputed effect are to enable higher cost Massachusetts dairy farmers to compete with lower cost dairy farmers in other States"); *Bacchus*, 468 U.S. at 270-71; *Hunt*, 432 U.S. at 352-33.  But this Court is unaware of a Supreme Court or Ninth Circuit case in which a law was invalidated under the dormant Commerce Clause solely on the ground of having a discriminatory purpose.  Other circuits, however, have found a discriminatory purpose as being sufficient to strike down a law.  *See S. Dakota Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583 (8th Cir. 2003); *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316 (4th Cir. 2001).

The Court finds it incongruous to say that a law violates the dormant Commerce Clause merely by having a discriminatory purpose.  As another court noted, "there is some reason to question whether a showing of discriminatory purpose alone will invariably suffice to support a finding of constitutional invalidity under the dormant Commerce Clause."  *Alliance of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 36 n.3 (1st Cir. 2005).  If local lawmakers intend to discriminate in favor of local interests, but mistakenly pass a law that does not so discriminate, did those lawmakers violate the dormant Commerce Clause simply by their mistaken intentions?  The Court doubts it.  The dormant Commerce Clause is aimed at deflecting *acts* of economic protectionism, not mere intent.  *See Wal-Mart Stores, Inc. v. City of Turlock*, 483 F. Supp. 2d 987, 1012-13 (E.D. Cal. 2006) (suggesting that discriminatory intent alone does not suffice to

invalidate a law under the dormant commerce clause).  Nevertheless, the Supreme Court has approved analyzing a law's purpose, and the Ninth Circuit has engaged in such analysis in dormant Commerce Clause cases.  *See, e.g.*, *Nat'l Ass'n of Optometrists I*, 567 F.3d at 525 (concluding the law did not have a discriminatory purpose).  The Court therefore finds itself obliged to do so here.

In arguing that the Ordinance has a discriminatory purpose, Plaintiffs rely on statements from the HSUS, records of City Council meetings, and a newspaper editorial.  Assuming that this evidence is admissible and relevant to the Ordinance's purpose, the Court finds that Plaintiffs have not shown that the purpose of the Ordinance was to burden out-of-state breeders in favor of local breeders.  Rather, the stated purpose was to help eliminate animal cruelty by preventing puppy mills from selling their dogs through local pet stores.  And although supporters were aware that local breeders might stand to benefit from the Ordinance, this was not the primary reason for its passage.  A sampling of the evidence cited by Plaintiffs shows this to be true.

In support of the Ordinance, City of Phoenix Councilmembers Simplot and Williams wrote in a newspaper editorial:

> There is no excuse for animal abuse, and that includes inhumane breeding practices used at 'puppy mills'. . . .  That is why we are working together to end the sale of puppy mill dogs in Phoenix and to require pet retailers to get their inventory from animal shelters or rescue organizations. . . .  If a puppy comes from out of state, it's a big red flag. . . .  [T]he ordinance [is] aimed at eliminating inhumane treatment of animals.

Doc. 137-37 at 4.  The formal agenda for the City Council meeting regarding the Ordinance stated that the Ordinance was aimed at eliminating "practices that are abusive to animals" and discussed the problems of puppy mills.  Doc. 137-24 at 5.  During the City Council meeting, proponents similarly argued that the Ordinance's purpose was to eliminate "practices that are abusive to animals, [including] selling animals bred in puppy and kitten mills[.]"  Doc. 137-23 at 24.  Councilwoman Williams emphasized that puppy mills are abusive to animals and worried that "the public gets ripped off oftentimes when they buy some of these dogs because they are not in good condition[.]"  *Id.* at 25.  She

also noted that "[y]ou can get purebred dogs from breeders locally and not off the Internet.  There's a very good system here in Phoenix."  *Id.* at 60.

The HSUS lobbied for the Ordinance and helped draft it.  After the City Council passed the Ordinance, the HSUS issued a press release:

> The new ordinance will help move the marketplace away from puppy mills, and toward consumers buying directly from responsible breeders and pet stores holding in-store adoptions of animals that come from shelters and rescue groups. . . .  We commend the humane leaders of Phoenix . . . for working to crack down on inhumane puppy mills.  By shrinking the supply of puppy mill dogs flowing into our market, the ordinance is expected to boost animal adoptions for homeless animals and increase sales for small, responsible breeders.

Doc. 137-36 at 44.  In another statement, the HSUS noted that "[i]f the trend of rejecting puppy mill dogs continues, it is reasonable to expect an expansion in the number of small, home-based breeders.  While the potential for inhumane conditions exists within the local breeder community, the smaller scale of home-based operations makes adequate care much easier to provide."  Doc. 137-23 at 5.

As stated by its proponents, the purpose of the Ordinance was to help eliminate the inhumane treatment of animals by preventing puppy mills from selling their animals in Phoenix pet stores.  The proponents were aware that the Ordinance might burden out-of-state businesses because most of the alleged puppy mills were located in other states.  They were also aware that local breeders might benefit from the Ordinance because these breeders could continue to operate in the Phoenix market.  But the Court cannot conclude that the proponents supported the Ordinance *because* it would shift sales from out-of-state breeders to local breeders or because puppy mills were usually located in other states.[11]  Plaintiffs have not indicated that local breeders lobbied for the Ordinance.

---

[11] Courts have not clearly identified the degree to which a discriminatory purpose must be a cause of the challenged law for a Commerce Clause violation to arise.  Commentators have suggested "substantial contribution" and "but for" tests.  *See* Donald H. Regan, *The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause*, 84 Mich. L. Rev. 1091, 1148-49 (1986) (arguing that a court should examine whether a discriminatory purpose was a "substantial contribution" to the passage of the law); Julian Cyril Zebot, *Awakening A Sleeping Dog: An Examination of the Confusion in Ascertaining Purposeful Discrimination Against Interstate Commerce*, 86 Minn. L. Rev. 1063, 1090-94 (2002) (recommending that a court examine whether a

Rather, there is evidence that the proponents hoped the Ordinance would shift sales from pet stores to animal shelters, not local breeders.  Doc. 137-23 at 5, 49; Doc. 137-36 at 44.[12]

In analyzing the intent behind a law, the Court must "'assume that the objectives articulated by the legislature are actual purposes of the statute, unless an examination of the circumstances forces [the court] to conclude that they could not have been a goal of the legislation.'" *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1097 (9th Cir. 2013) (quoting *Clover Leaf Creamery,* 449 U.S. at 463 n.7).  The articulated objective of the Ordinance was to help eliminate animal cruelty that might be occurring at puppy mills.  This is not a purpose of discriminating against interstate commerce, and the circumstances surrounding the passage of the Ordinance do not suggest otherwise.[13]

### E.    *Pike* Balancing.

A law that does not discriminate against interstate commerce, but "burden[s] interstate transactions only incidentally," is subject to what has come to be known as the *Pike* balancing test.  *See Maine*, 477 U.S. at 138.  Under this test, "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."  *Pike*, 397 U.S. at 142.  The burdens to be weighed are those that a local law imposes on the "interstate flow of goods, not the share of profits obtained by . . . interstate corporations."

---

discriminatory purpose was a "but for" cause of the challenged law).  The Court concludes that the alleged discriminatory purpose of favoring local breeders was neither a substantial contribution to, nor a but-for cause of, the Ordinance's passage.

[12] Plaintiffs stress that the City Council did not study the effectiveness of the Ordinance in reducing sales from puppy mills.  But this failure tells little about the Ordinance's purpose beyond the fact that its proponents felt that such studies were unnecessary.

[13] The Court is not clear on whether the discriminatory purpose of the Ordinance is a matter of construction for the Court or a matter that would be submitted to a factfinder at trial, and the parties do not address this issue in their briefs.  If the latter is the case, the Court finds that Plaintiffs have failed to present sufficient evidence for a reasonable factfinder to conclude that the purpose of the Ordinance is protectionist.

*Nat'l Ass'n of Optometrists & Opticians v. Harris* (*Nat'l Ass'n of Optometrists II*), 682 F.3d 1144, 1155 (9th Cir. 2012).  The benefits to be weighed are the "putative" benefits of the law, not the actual benefits.  *Id.* at 1155.  Although the *Pike* test is deferential, courts have applied it to strike down nondiscriminatory laws "where such laws undermined a compelling need for national uniformity in regulation."  *Gen. Motors Corp.*, 519 U.S. at 299 n.12 (collecting cases).

*Pike* balancing is another area of some confusion in the law.  As suggested above, the Court concludes that a law that has no more than a *de minimis* effect on interstate commerce is properly evaluated under the deferential test from *Pike*.  This is consistent with the statement in *Pike* itself that the balancing test applies when the law's effect on commerce is "incidental."  397 U.S. at 142.  The Ninth Circuit holds, however, that *Pike* balancing applies only when the law's effect on commerce is significant:  "If a regulation merely has an effect on interstate commerce, but does not impose a significant burden on interstate commerce, it follows that there cannot be a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits' under *Pike*."  *Nat'l Ass'n of Optometrists II*, 682 F.3d at 1155.  Such a significant effect, in the Court's view, suggests a discriminatory effect that would invoke strict scrutiny, not *Pike* balancing.  The Ninth Circuit's approach thus seems to blur the line between strict scrutiny and *Pike* balancing, but this is not a new development.  As other cases have noted, the line between strict scrutiny and *Pike* balancing is not easily discerned.  *See Gen. Motors Corp.*, 519 U.S. at 298 n.12.  The Court need not wrestle with this issue further, however, because it concludes that the Ordinance survives all versions of *Pike* balancing.

As noted above, Plaintiffs have failed to present sufficient evidence for a reasonable factfinder to find more than a *de minimis* effect on interstate commerce.  It follows that Plaintiffs have failed to present sufficient evidence to establish a significant burden on interstate commerce as required by the Ninth Circuit approach.

The Ordinance also survives more traditional *Pike* balancing.  Leaving aside the benefit of reducing the market for puppy-mill dogs, which Plaintiffs argue is not a

permissible local interest, the Ordinance also has the putative benefit of reducing Phoenix's problem with animal homelessness and euthanasia.  As noted earlier, in 2014 MCACC took in 38,235 animals, almost 34,000 of which were dogs.  Doc. 157-42 at 5.  Although MCACC found new homes for 11,382 dogs and returned another 4,183 to their owners, approximately 10,160 dogs were euthanized.  *Id.* at 5.  By requiring pet stores to sell dogs from shelters instead of commercially-bred dogs, the Ordinance will have the putative benefits of increasing the number of adoptions and reducing dog homelessness and euthanasia.  The Court cannot conclude that the *de minimis* burden imposed on interstate commerce by the Ordinance is "clearly excessive" when compared to this local benefit.[14]

### F.      Dormant Commerce Clause Conclusion.

"The modern law of what has come to be called the dormant Commerce Clause is driven by concern about 'economic protectionism, that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'"  *Dep't of Revenue of Ky.*, 553 U.S. at 337-38 (quoting *New Energy Co.*, 486 U.S. at 273-74).  The Ordinance is not an act of economic protectionism.  It is a legitimate attempt to curb the problems associated with the inhumane treatment of animals and local dog homelessness and euthanasia.  Plaintiffs' claim that the Ordinance violates the dormant Commerce Clause fails as a matter of law.

### V.      Equal Protection.

Plaintiffs claim that the Ordinance violates the Equal Protection Clause of the United States Constitution and the Privileges or Immunities Clause of the Arizona Constitution.  U.S. Const. amend. XIV; Ariz. Const. art. II, § 13.  These clauses are "substantially the same in effect[.]"  *Chavez v. Brewer*, 214 P.3d 397, 408 (Ariz. Ct. App.

---

[14]  "To the extent that Plaintiffs argue that the [Court] must consider less burdensome alternatives [to the Ordinance], 'case law requir[es] the consideration of less restrictive alternatives only when heightened scrutiny is required.'  Because the Ordinance is not discriminatory and does not directly regulate interstate commerce, heightened scrutiny is not required."  *Pharm. Research*, 768 F.3d at 1046 n.4 (quoting *Nat. Ass'n of Optometrists II*, 682 F.3d at 1157).

2009).  "The Equal Protection Clause guarantees that the government will not classify individuals [and groups] on the basis of impermissible criteria."  *Coal. for Econ. Equity v. Wilson*, 122 F.3d 692, 702 (9th Cir. 1997).  If a law's classification does not burden a fundamental right or a protected class of persons, the law must be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification," *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993), or "if 'there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.'"  *Armour v. City of Indianapolis, Ind.*, 132 S. Ct. 2073, 2080 (2012) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992)).  "This standard of review is a paradigm of judicial restraint," *Beach Commc'ns, Inc.*, 508 U.S. at 314, and laws not involving fundamental rights or suspect classifications are "accorded a strong presumption of validity," *Heller v. Doe*, 509 U.S. 312, 319 (1993).

The parties agree that the Ordinance does not involve fundamental rights or suspect classifications.  The relevant class consists of pet stores, which the Ordinance singles out in its regulations.  Plaintiffs argue that the purpose of the Ordinance is to eliminate puppy mills, and that the Ordinance bears no rational relationship with this purpose because it targets pet stores like Puppies N' Love that do not buy dogs from puppy mills.  The Court disagrees.  Not only is it "reasonably conceivable" that pet stores obtain dogs from puppy mills, but Defendant has produced evidence that Puppies N' Love has bought dogs from a few breeders who have practices that some might view as inhumane.  Doc. 148 at 6-12.  Thus, "the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." *Nordlinger*, 505 U.S. at 11.  And there is another legitimate purpose to which the Ordinance is rationally related – reducing animal homelessness and euthanasia.  As already discussed, by requiring pet stores to sell animals obtained from shelters instead of breeders, the

Ordinance could arguably reduce dog homelessness and euthanasia.  *See* Doc. 148-1 at

245-46.  The Ordinance does not violate the Equal Protection Clause or the Privileges or

Immunities Clause.

**VI.    Special Law.**

The Arizona Constitution prohibits special laws that grant "to any corporation,

association, or individual, any special or exclusive privileges, immunities, or franchises."

Ariz. Const. art. IV, pt. 2 § 19(13).  Nor shall a special law be enacted "[w]hen a general

law can be made applicable."  *Id.* § 19(20).  "While the equal protection clause prohibits

unreasonable discrimination *against* a particular class, the special legislation clause

prohibits unreasonable discrimination in *favor* of a particular class."  *Lerma v. Keck*, 921

P.2d 28, 34 (Ariz. Ct. App. 1996) (emphasis in original).  Thus, a law "may withstand

equal protection review, yet still be found unconstitutional under the special/local law

provision."  *Republic Inv. Fund I v. Town of Surprise*, 800 P.2d 1251, 1257 (Ariz. 1990).

A law is general, not special, if: "(1) the classification is rationally related to a legitimate

governmental objective, (2) the classification is legitimate, encompassing all members of

the relevant class, and (3) the class is elastic, allowing members to move in and out of it."

*Long v. Napolitano*, 53 P.3d 172, 178 (Ariz. Ct. App. 2002) (citing *Republic Inv. Fund I*,

800 P.2d at 1257).

The essence of Plaintiffs' special-law argument is that the Ordinance bestows

special favors on local breeders and animal shelters.  More specifically, Plaintiffs argue

that the Ordinance does not encompass all members of the relevant class.  Plaintiffs

reason that because a goal of the Ordinance is to decrease sales of dogs from puppy mills,

and because local breeders may be running puppy mills and shelters may obtain dogs that

originated in puppy mills, the Ordinance should apply to local breeders and animal

shelters, not just pet stores.

The question, however, is whether the Ordinance "applies only to certain members

of a class or to an arbitrarily defined class which is not rationally related to a legitimate

legislative purpose."  *Arizona Downs v. Arizona Horsemen's Found.*, 637 P.2d 1053,

1060 (Ariz. 1981).  The classification must have "a basis founded in reason." *Arizona v. Loughran*, 693 P.2d 1000, 1002 (Ariz. Ct. App. 1985).  An Arizona court has upheld against a special-law challenge an Ordinance that regulated smoking inside of restaurants but not bars and bowling alleys.  *City of Tucson v. Grezaffi*, 23 P.3d 675, 684 (Ariz. Ct. App. 2001).  The court found that that the city could rationally limit the class to restaurants even though bars and bowling alleys contributed to the problem of indoor smoking.  *Id.*  Here also, the City of Phoenix, in trying to limit the sale of puppy-mill dogs, could rationally limit the Ordinance to pet stores.  Pet stores, unlike local breeders and animal shelters, import animals from out-of-state breeders which may be operating puppy mills.  While local breeders might also be puppy mills, they are subject to the direct oversight of the City and may therefore be regulated by other means.  And while animal shelters might offer for adoption animals that originated at puppy mills, many of the animals that shelters offer did not originate at puppy mills.  In sum, the Ordinance's classifications are not arbitrarily drawn.  Because the Ordinance is rationally related to a legitimate government purpose and its classification is elastic, it is not a special law.

**VII.  Preemption.**

Plaintiffs contend that A.R.S. §§ 44-1799 *et seq.* preempts the Ordinance.  The City argues that the Ordinance is a lawful exercise of the City's authority and does not conflict with the statute.   "The City of Phoenix, as authorized by the Arizona Constitution, Article 13, Section 2, has adopted a charter permitting it to enact municipal ordinances." *Arizona v. McLamb*, 932 P.2d 266, 269 (Ariz. Ct. App. 1996).  As a charter city, it "may exercise all powers granted by its charter, provided that such exercise is not inconsistent with either the constitution or general laws of the state." *Jett v. City of Tucson*, 882 P.2d 426, 429 (Ariz. 1994); *see also* A.R.S. § 9-284(B).  The City of Phoenix "is granted autonomy over matters of local interest." *City of Tucson v. Arizona*, 333 P.3d 761, 763 (Ariz. Ct. App. 2014).

The relationship between state statutes and local ordinances has been explained as follows:

> In matters of solely local concern, a charter city's ordinance supersedes a conflicting state statute. However, in matters of both local and statewide concern, a charter city's ordinance is invalid if it conflicts with a valid state statute. But there must be an actual conflict. Mere commonality of some aspect of subject matter is insufficient, and the ordinance and the statute must not be capable of peaceful coexistence. And, although a city ordinance on a matter of local and statewide concern must not conflict with a statute, it may be more restrictive than the statute, may parallel it, or even go beyond it.

*City of Tucson v. Consumers For Retail Choice Sponsored by Wal-Mart*, 5 P.3d 934, 936-37 (Ariz. Ct. App. 2000) (quotation marks and citations omitted). An ordinance may also be invalid if it enters a field occupied by the state. *Id.* at 937. But "to find preemption through state occupation of the field, '[t]he existence of a preempting policy must be clear. Also, the assertedly competing provisions in question *must be actually conflicting rather than capable of peaceful coexistence.*'" *Union Transportes de Nogales v. City of Nogales*, 985 P.2d 1025, 1030 (Ariz. 1999) (emphasis in original) (quoting *Jett*, 882 P.2d at 432).[15]

Assuming that the regulation of pet stores involves a matter of statewide concern, the Court can discern no conflict between the Ordinance and A.R.S. §§ 44-1799 *et seq.* The Ordinance prohibits pet stores from selling animals obtained from commercial breeders. The statute also regulates pet stores, which are defined as "commercial establishment[s] that engage[] in a for-profit business of selling at retail cats, dogs or other animals[.]" *Id.* § 44-1799. The statute requires pet stores to provide adequate housing, food, space, and veterinary care for their animals. *Id.* § 44-1799.04. The statute also requires a pet store to refund the cost of a pet if a veterinarian, within a certain

---

[15] In *Consumers For Retail Choice*, decided after *Union Transportes de Nogales*, the Arizona Court of Appeals stated that "[e]ven if a city ordinance on a matter of local and statewide concern does not conflict with a state statute, however, it may nevertheless be invalid if the state has appropriated the field." 5 P.3d at 937. Earlier decisions have reached the same conclusion. *See State v. Mercurio*, 736 P.2d 819, 823 (Ariz. Ct. App. 1987) (finding that "[w]here there is no direct conflict between state statutes and the exercise of power authorized by a city's charter, our inquiry is whether the state legislation has . . . completely occupied the field"). These decisions appear inconsistent with the Arizona Supreme Court's emphasis that, even if the state has occupied a field, there must be an actual conflict between the statute and Ordinance in order for the Ordinance to be preempted. *Union Transportes de Nogales*, 985 P.2d at 1030; *see also Winkle v. City of Tucson*, 949 P.2d 502, 505 (Ariz. 1997) ("To be preempted, a municipal ordinance must actually conflict with governing state law.").

amount of time, certifies that the animal was ill when sold. *Id.*, § 44-1799.05. The state may assess penalties against a store for violating the statute. *Id.* §44-1799.08.

The statute and Ordinance certainly regulate the same subject, but "[m]ere commonality" of subject matter does not create a conflict. *Consumers For Retail Choice*, 5 P.3d at 937. "[A] conflict exists only where a statute and ordinance are mutually exclusive, so that compliance with both is impossible." *Wonders v. Pima Cnty.*, 89 P.3d 810, 813 (Ariz. Ct. App. 2004). Here, compliance with both is not impossible. Under the Ordinance, a pet store is unable to purchase animals from commercial breeders for resale, but it may nonetheless comply with the statute by ensuring the health of the animals it acquires from shelters and humane societies. Plaintiffs argue that the statute specifically authorizes the sale of animals bred by USDA-licensed breeders. The Court does not agree. The statute simply requires a pet store to give certain information to a customer "*if the animal is from a source that is licensed by the [USDA].*" A.R.S. §§ 44-1799.02 (emphasis added). There being no conflict between the Ordinance and statute, Plaintiffs' preemption claim fails as a matter of law.

## VIII.  Conclusion.

Puppies 'N Love appears to be an exemplary pet store. The store avoids buying from puppy mills and works hard to ensure that its puppies have been raised in a humane and caring environment. No doubt, the burden of the Ordinance will fall hard on the Puppies 'N Love store in Phoenix. But the Court's place is not to judge the wisdom or fairness of the City's decision to pass the Ordinance. Rather, the Court may judge only whether the Ordinance conflicts with the constitutional provisions Plaintiffs have cited. There being no conflict between the Ordinance and the United States and Arizona Constitutions, the Court must uphold the Ordinance and grant summary judgment for the Defendant City of Phoenix and the HSUS.

**IT IS ORDERED:**

1.    Plaintiffs' motion for summary judgment (Doc. 143) is **denied**.

2.    Defendant and Intervenor's motion for summary judgment (Docs. 147,

151) is **granted**.

3.      Plaintiffs' and Intervenor's motions to seal (Docs. 149, 159) are **granted**.

4.      The Clerk is directed to enter judgment and terminate this action.

Dated this 24th day of July, 2015.

_____
David G. Campbell
United States District Judge